## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**JESSICA W. SEALS**

       **Plaintiff,**

v.

**LOWE ENGINEERS, LLC**

       **Defendant.**

**CIVIL NO. 2:22-CV-1438**

## COMPLAINT

Plaintiff Jessica W. Seals asserts her causes of action against defendant Lowe Engineers, LLC as follows:

## THE PARTIES

1.    Plaintiff is Jessica W. Seals, a person of age and majority, and a Louisiana citizen residing in the city of Franklinton within Washington Parish.

2.    Defendant is Lowe Engineers, LLC (hereinafter "Lowe"), a foreign limited liability company organized and headquartered in Atlanta, Georgia, but which, upon information and belief, is also registered and actively doing business in Louisiana with offices in St. Tammany Parish.

## JURISDICTION AND VENUE

3.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. §§ 2000e-2 *et seq*. (Title VII) as more particularly set-out herein.

4.    The Court has supplemental, subject-matter jurisdiction over Ms. Seals' state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to her federal law claims that they form part of the same case or controversy as more particularly set-out herein.

5.    The Court has personal jurisdiction over Lowe Engineers, LLC because it is a foreign

1

limited liability company registered and actively doing business in Louisiana, with offices in St. Tammany Parish, and, through its registered agent for the service of process, Business Filings Incorporated, is present within Louisiana at the time this suit commenced.

6.      Alternatively, the Court has personal jurisdiction over Lowe Engineers, LLC because, upon information and belief, it regularly transacts business in Louisiana and regularly employs Louisiana citizens, committed unlawful employment acts within Louisiana giving rise to the causes of action in this case, and derives substantial revenue from the services it provides in Louisiana. Thus, Lowe Engineers, LLC has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

7.      Venue for Ms. Seals' Title VII claims is proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) (Title VII's venue provision) because (1) the unlawful employment practice alleged herein was committed within this judicial forum (specifically, St. Tammany Parish), (2) upon information and belief the employment records relevant to this action are found in this judicial district (specifically, St. Tammany Parish), and (3) but for the unlawful employment practice, Ms. Seals would have been employed in this district (specifically, St. Tammany Parish).

8.      Venue for Ms. Seals' supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Lowe Engineers, LLC is susceptible to this Court's personal jurisdiction in this forum.

9.      Alternatively, venue for Ms. Seals' supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Lowe Engineers, LLC's unlawful acts, as well as Ms. Seals' resulting injuries and damages, giving rise to this lawsuit occurred within this judicial district (specifically, St. Tammany Parish) and, accordingly, a substantial part of the events or

omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PROCEDURAL AND STATUTORY REQUIREMENTS

10.     At all relevant times, upon information and belief, Lowe employed between 101 to 200 full-time employees.

11.     Beginning in 2009, Ms. Seals began her employment with John Bonneau and Associates, an entity that was purchased and absorbed into Lowe Engineers, LLC in 2019.

12.     Ms. Seals was continuously employed by Lowe from approximately June 1, 2019 until her constructive discharge on approximately July 21, 2021.

13.     At the time of her constructive discharge, Lowe employed Ms. Seals as a Drafter in Lowe's Mandeville, Louisiana office.

14.     On or about July 21, 2021, Ms. Seals' resigned in constructive discharge of her employment.

15.     On or about October 28, 2021, Ms. Seals timely filed her Charge of Discrimination (EEOC No. 461-2021-01898) with the EEOC Field Office in New Orleans alleging, in substance, that Lowe unlawfully subjected Ms. Seals to sexual harassment and a hostile work environment based on sex which ultimately resulted in Ms. Seals' constructive discharge.

16.     On February 22, 2022, the EEOC issued its Notice of Right to Sue letter to Ms. Seals.

17.     Ms. Seals timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

**A.     The Plaintiff – Ms. Jessica Seals**

18.     Jessica Seals is a 36-year-old woman who lives in Franklinton, Louisiana with her minor daughter.

19.     Ms. Seals and her daughter rely on Ms. Seals' income to support themselves.

20.     At all relevant times in this case, however, Ms. Seals was married.

21.     Ms. Seals has spent the majority of her professional work-life in the field of land survey drafting.

22.     Lowe acquired Ms. Seals' previous employer, John Bonneau and Associates, in 2019.

23.     On approximately July 1, 2019, Ms. Seals submitted a formal employment application to Lowe to continue working in her same position as part of Lowe's acquisition of John Bonneau and Associates.

24.     Lowe agreed and contemporaneously hired Ms. Seals as its employee.

25.     Ms. Seals continued to work for Lowe as a Drafter in its Mandeville office until her constructive discharge on July 21, 2021.

26.     Ms. Seals' constructive discharge and resulting financial strain caused her and her family significant mental, emotional, and financial burden that continues today.

27.     Ms. Seals' husband filed for divorce after her constructive discharge.

28.     One of the significant factors leading to Ms. Seals' divorce was the financial and emotional strain that the harassment and constructive discharge in this case caused Ms. Seals and her family.

**B.     The Defendant – Lowe Engineers, LLC**

29.     Lowe Engineers, LLC is a foreign limited liability company formed in Georgia in September 1998.

4

29.     Lowe maintains offices and conducts business in Georgia, Texas, Alabama, and Louisiana.

30.     Lowe's main headquarters is located in Atlanta, Georgia.

31.     In 2019, Lowe purchased John Bonneau and Associates, Ms. Seals' employer at the time, and integrated Ms. Seals and Bonneau's other employees into Lowe's own employee workforce.

32.     At all relevant times, Lowe maintained a human resources department and employed a director of human resources.

33.     At all relevant times in the case, Ms. Seals' immediate supervisor was Steven Hebert, who was the Mandeville office's Senior Drafter.

34.     At all relevant times in the case, Ms. Seals' ultimate supervisor at the Mandeville office was John Bonneau (who was also hired by Lowe as its employee during the acquisition of John Bonneau and Associates), the office's Lead Surveyor.

35.     At all times relevant to this case, Josh Daniel was a partner, shareholder, member of the board, and the "Head of Survey" at Lowe.

36.     As the Head of Survey, Mr. Daniel exercised regional supervision over all of Lowe's offices in Louisiana, including its Mandeville office.

37.     As the Head of Survey, Mr. Daniel held decision-making authority to promote, demote, discipline, and terminate Ms. Seals' employment.

38.     Upon information and belief, as a partner and member of the Lowe board of directors, Mr. Daniel held the decision-making authority to act for and bind Lowe, and Mr. Daniel's actions constituted either the in-fact or contractual actions of Lowe.

39.     At all relevant times in this case, Mr. Daniel knew that Ms. Seals was married.

40.     At all relevant times in this case, Mr. Daniel was married.

41.     At all times relevant to this case, Josh Daniel's father, William J. Daniel, III was the

majority owner of Lowe and its Chief Operating Officer.

42.     At all times relevant to this case, Jon Drysdale was the managing partner of Lowe.

43.     Thus, at all relevant times in the case, Ms. Seals' management hierarchy looked like this:



Jon Drysdale (Managing Partner)
|
William "Bill" Daniel (Partner, Chief Operating Officer)
|
Josh Daniel (Partner, Head of Survey)
|
John Bonneau (Lead Surveyor)
|
Steven Hebert (Senior Drafter)
|
Jessica Seals (Drafter)

**C.     Lowes' Predecessor Company Had a History of Serious Sexual Harassment**

44.     During her employment with John Bonneau & Associates, Ms. Seals was subjected to an overt, sexually harassing hostile work environment.

45.     Specifically, during 2009 and 2010, Ms. Seals was sexually harassed by Brandon McCain, a John Bonneau employee who worked out of a branch office located in Mandeville, Louisiana.

46.     Upon information and belief, during this period of time, Josh Daniel also worked out of the Robert, Louisiana office and was friends with Brandon McCain.

47.     Ms. Seals first met Mr. Daniel during a joint project between John Bonneau and Associates and Lowe.

48.     During this time, Brandon McCain routinely made sexually explicit comments to Ms. Seals and touched her many times without permission.

49.     Specifically, Mr. McCain routinely found opportunities to touch Ms. Seals' legs, lift her skirt up with his hands, and hug her.

50.     Ms. Seals complained many times to John Bonneau and others.

51.     Eventually, Mr. Bonneau terminated Mr. McCain's employment.

52.     In turn, Mr. McCain's termination resulted in the permanent closure of Lowe's office in Robert, Louisiana.

53.     After Lowe purchased John Bonneau and Associates, Ms. Seals met with both Josh Daniel and his father, William Daniel, to discuss her expectations if she accepted continued employment with Lowe.

54.     Specifically – and based on the fact that Mr. Daniel was friends with Ms. Seals' prior harasser – Ms. Seals asked for an assurance that sexual harassment would not be tolerated in her workplace.

55.     Both Josh and William Daniel assured Ms. Seals that sexual harassment would not be tolerated.

**D.     Josh Daniel Begins Sexually Harassing Ms. Seals**

56.     Shortly after Ms. Seals transitioned her employment to Lowe, Josh Daniel began sexually harassing her in the workplace.

57.     Mr. Daniel engaged in the following specific acts of harassment both publicly and privately in the workplace, both in person and through telephone and video calls, throughout the two year of Ms. Seals' employment until her constructive discharge in July 2021:

- Daniel routinely and repeatedly asked Ms. Seals to send him pictures of herself

- Daniel routinely and repeatedly asked Ms. Seals to tell him what she was wearing

- Daniel routinely and repeatedly asked Ms. Seals to dress in particular ways to please him, usually by telling Ms. Seals to "wear something cute" to in-person meetings.

- Daniel told Ms. Seals to buy a dress for a company function that would "show off

7

her legs."

- Daniel told Ms. Seals she should be part of Lowe's marketing team because of her "good looks."

- Daniel asked Ms. Seals to send him photographs of her shoes and feet.

58.    On June 29, 2021, Daniel called Ms. Seals while she was home on permitted sick leave.

59.    Daniel asked Ms. Seals if she was wearing pajamas.

60.    When Ms. Seals answered in the affirmative, Daniel said that was "even more reason to Facetime with you" (meaning, to video conference with Ms. Seals so Daniel could see her in her pajamas).

61.    Ms. Seals told Daniel that during that call and later via text message that his comment was inappropriate.

62.    Daniel apologized via text message, writing "I won't joke", "It was not right", "Sorry".

63.    Ultimately, Mr. Daniel continued this sort of overt, sexual harassment throughout Ms. Seals' entire employment, frequently calling and demanding to Facetime with Ms. Seals at all times of the week, including after hours and on weekends.

64.    Daniel's behavior fell into an obvious pattern, wherein he would routinely and repeatedly call Ms. Seals ostensibly for work; she would answer; and Daniel would demand to talk to her about various personal and inappropriate topics, asking Ms. Seals what she was wearing, what she was doing, and so on and so forth.

65.    In reality, it was objectively obvious to Ms. Seals and everyone else at the Mandeville office that Mr. Daniel was attracted to Ms. Seals and that he routinely and repeatedly used his position as her regional decision-maker to dominate her time and attention both during and outside of work in order to obtain some sort of romantic or sexual relationship with Ms. Seals.

66.     In fact, Ms. Seals did reasonably perceive that Mr. Daniel's overtures were an attempt to pressure her into some sort of romantic or sexual relationship.

67.     In context, any reasonable person – man or woman – would have understood that Mr. Daniel was attempting to leverage his status as her supervisor and decision-maker to force her into some sort of romantic or sexual relationship.

68.     In context, no reasonable employer would have tolerated Mr. Daniel's behavior, because his behavior was unwelcome, overt and objectively and obviously designed to pressure Ms. Seals into some sort of romantic or sexual relationship with him.

69.     In context, no reasonable employee would have tolerated Mr. Daniel's behavior because Mr. Daniel's behavior was sexually harassing, nonstop, overt, intrusive, unwelcomed, and – because Mr. Daniel was a partner and decision-maker at Lowe – his harassment carried the implicit risk that rebuffing his advances would lead to adverse employment actions.

70.     In context, Ms. Seals reasonably perceived that the only way she would progress within Lowe in her position as a Drafter would be to submit to Mr. Daniel's advances.

71.     Ms. Seals also reasonably believed that if she complained about Mr. Daniel's harassment, she would be punished, replaced, or terminated.

72.     Despite her fears, however, Ms. Seals refused to submit to Mr. Daniel's advances, and Ms. Seals repeatedly told Mr. Daniel that his comments and behavior were inappropriate and unwelcomed.

73.     Despite Ms. Seals' rebuffs, Mr. Daniel's advances continued, essentially nonstop, for the entire two years that Ms. Seals worked for Lowes' until her constructive discharge.

**E.      Ms. Seals Routinely Complained about Mr. Daniel's Harassment but Her Supervisors Did Nothing to Protect Her**

74.     Ms. Seals first complained about Daniel's harassment about two weeks after beginning

with Lowe to her immediate and second-line supervisors, Steven Hebert and John Bonneau (respectively).

75.     Ms. Seals told both men that Daniel asked her to send him photographs of her shoes and feet.

76.     Ms. Seals told her supervisors that Daniel's behavior was inappropriate and unwelcomed.

77.     The two supervisors agreed that Mr. Daniel had acted inappropriately.

78.     But, neither men reported Daniel's misconduct or took any corrective action to protect Ms. Seals.

79.     Instead, the men directed Ms. Seals to complain to Human Resources.

80.     In context, Ms. Seals understood that Bonneau and Hebert did not want to complaint about Mr. Daniel or protect Ms. Seals for the same reason that Ms. Seals was reticent about formally complaining about Daniel to human resources: Daniel was an owner of Lowe, a member of its board of directors, the regional supervisor of all of Lowe's Louisiana offices, and had the power to terminate Seals, Bonneau, and Hebert.

81.     Toward the end of 2019, Ms. Seals attended a job fair at Southeastern University with Mr. Daniel.

82.     Mr. Daniel told Ms. Seals to buy a dress for the fair that "showed off her legs" for the event.

83.     Although humiliated, Ms. Seals felt compelled to buy a new dress because Mr. Daniel held authority over her.

84.     Ms. Seals complained again about Mr. Daniel's harassment to Mr. Bonneau and Mr. Hebert.

85.     While Bonneau and Hebert agreed the conduct was harassing, neither reported Daniel's

misconduct or took any action to protect Ms. Seals.

86.     Meanwhile, throughout her entire employment at Lowe, Ms. Seals routinely admonished Mr. Daniel that his comments, flirtations, requests, and behavior were inappropriate and unwelcomed.

87.     In context, Mr. Daniel must have understood that his advances towards Ms. Seals were unwelcome and harassing.

88.     In context, any reasonable person – man or woman – would have understood that Mr. Daniel's advances towards Ms. Seals were unwelcome and harassing.

**F.     Ms. Seals Complains about Josh Daniel, and He Responds by Ordering Ms. Seals to Train Her Own Replacement**

89.     As described earlier in this complaint, on or about June 29, 2021, Josh Daniel inappropriately asked to videoconference with Ms. Seals after he learned she was at home on sick leave and in her pajamas.

90.     Ms. Seals again complained to Mr. Bonneau about Mr. Daniel's misbehavior.

91.     This time, however, Mr. Bonneau contacted Mr. Daniel and told him that Ms. Seals was upset.

92.     Mr. Bonneau reported back to Ms. Seals that Daniel became angry and upset upon hearing the complaint, and that Daniel defended himself by accusing Ms. Seals of "overreacting" to what he described as "locker room talk."

93.     Within days or so after Mr. Bonneau reported back to Ms. Seals, the only other woman at the Mandeville office – Megan Bourgeois – told Ms. Seals that she had been instructed to train with Ms. Seals to learn how to perform her drafting duties.

94.     Ms. Bourgeois told Ms. Seals the order had come from Mr. Daniel through Mr. Bonneau.

95.     Ms. Bourgeois admitted to Ms. Seals that Daniel had privately told Bourgois that he wanted

her to be his "eyes and ears" at the Mandeville office, and that Ms. Seals was "too tightly wound up."

96.    Ms. Seals complied and began teaching Ms. Bourgeois how to perform land survey drafting.

97.    In context, Ms. Seals reasonably and correctly understood that Mr. Daniel was punishing her for complaining about him, specifically by ordering Ms. Seals to train her own replacement in the runup to her likely termination.

**G.    Lowe Management Likewise Fostered Overt Sexism in the Workplace Despite Ms. Seals' Complaints**

98.    Separate and apart, throughout her two-year employment at Lowe, Ms. Seals witnessed and was subjected to many sexist comments, attitudes, and decisions in her workplace.

99.    In one instance, around May or June 2021 to the best of Ms. Seals' recollection, an objectively qualified woman applied for a job at Lowe's Lafayette office.

100.    Ms. Seals heard the decision-maker for the job – a man assigned to the Lafayette office who was physically at the Mandeville office that day – joke during a meeting that he would not hire the woman because he did not want "a woman to mess up the office vibe."

101.    Ms. Seals heard the other Lowe employees in the room – all men – laugh.

102.    The woman was not hired for the job.

103.    In another instance, around May or June 2021, Ms. Seals heard another supervisor in the Mandeville office – a man named Don Ventura – seriously remark that "women drafters just don't have the same mechanical mindset as men."

104.    This was one of many sexist comments Mr. Ventura had made in the workplace.

105.    Mr. Ventura made this comment directly to Steven Hebert, another of Ms. Seals' drafting supervisors.

106.    Mr. Hebert later approached Ms. Seals and admitted Mr. Ventura's comment was inappropriate, and both Mr. Hebert and Ms. Seals reported the incident to Mr. Bonneau.

107.    But Mr. Bonneau neither corrected Mr. Ventura nor reported the incident himself.

108.    Instead, Mr. Bonneau told Ms. Seals she could report the incident herself to Lowe human resources if she liked.

109.    Ms. Seals did complain to Lowe's Human Resources manager, Chynita Hopps, by telephone and to the best of her recollection by email around May or June 2021.

110.    Ms. Seals complained that there was a culture of sexist attitudes at the Mandeville office, and described Mr. Ventura's sexist comments.

111.    Ms. Seals also described that Mr. Ventura had a habit of other sexist behaviors and comments, including ordering women (but never men) to pour him coffee and take his notes.

112.    Ms. Seals also described that Mr. Ventura had previously excluded Ms. Seals from work meetings, and that Ms. Seals understood she was being excluded because she was a woman.

113.    Ms. Seals also described other of Mr. Ventura's various sexist comments, including that women should not be concerned with cars or car maintenance because those were a "man's job."

114.    During those same communications with Ms. Hopps, Ms. Seals also described the incident concerning the woman who had applied for a job at Lowe's Lafayette office but who was passed over because she was a woman.

115.    Ms. Seals asked that Lowe conduct some sort of workplace training to coach against these sorts of sexist attitudes and harassing behaviors.

116.    But, to the best of Ms. Seals' knowledge, no such trainings ever took place.

117.    During her entire employment at Lowe, Ms. Seals was the only woman assigned to its drafting department, and one of only two women who worked in the entire office in any position

out of about twenty or so employees.

118.    The only other woman assigned to Lowe's Mandeville office was Megan Bourgeois.

119.    Within about one day or so after Ms. Seals complained to Ms. Hopps regarding the Mandeville office's sexist attitudes, Mr. Bonneau ordered Ms. Seals to ensure Ms. Bourgeois shadowed her in her job every day.

120.    Upon information and belief, that order came directly from Josh Daniel as punishment for rebuffing and reporting on the Mandeville office's sexist workplace.

**H.    Ms. Seals Complains to Human Resources about Josh Daniel and Is Pressured to Resign**

121.    Ms. Seals contacted Lowe's Human Resources manager, Chynita Hopps, about Mr. Daniel's harassment on or about July 20 or 21, 2021.

122.    During that call, Ms. Seals complained that Daniel routinely made inappropriate comments to her throughout her entire employment; that Daniel had asked Ms. Seals to send him photographs of her shoes and feet; that Daniel routinely asked what Ms. Seals was wearing; that Daniel routinely asked to Facetime with Ms. Seals without any business reason; that it was obvious Daniel was harassing her for some sort of romantic or sexual relationship; that Daniel had punished her because she complained to Ms. Hopps about the Mandeville office's sexist workplace; and that Ms. Seals could not take any more of the harassment and intended to resign.

123.    Ms. Hopps at first acknowledged Daniel's misbehavior and admitted that Daniel treated other women at Lowe's Atlanta office the same way but nothing could be done about it.

124.    In context, Ms. Hopps essentially and impliedly acknowledged that Mr. Daniel was out of control but could not be stopped because of his ownership and leadership position within the company, and because Daniel was the son of the majority owner, Bill Daniel.

125.    Ms. Hopps acknowledged that she understood Ms. Seals' desire to resign under the

conditions she described.

126.    Ms. Hopps asked Ms. Seals to wait so that Hopps could speak with the other owners of the firm to see how Hopps could handle the situation.

127.    Ms. Seals said that she would wait to hear back from Ms. Hopps.

128.    Ms. Hopps called Ms. Seals back that same morning.

129.    Ms. Hopps demeanor and tone markedly changed during that subsequent phone call.

130.    Whereas before Ms. Hopps expressed acknowledgement, understanding, and sympathy for Ms. Seals, during this second phone call Ms. Hopps was curt and had an adversarial tone and demeanor.

131.    To the best of Ms. Seals' recollection, Ms. Hopps indicated she spoke to Mr. Drysdale (the managing partner) and Ms. Riker (another owner) about Ms. Seals' complaint.

132.    Ms. Hopps curtly described that if Ms. Seals was dissatisfied with her work environment, then she should resign.

133.    Ms. Hopps did not offer any help, assistance, or protection to Ms. Seals against Mr. Daniel's harassment.

134.    Ms. Hopps did not offer to investigate, reprimand, or discipline Mr. Daniel in any way for his harassment.

135.    In context, Ms. Seals reasonably and correctly understood Ms. Hopps' comments, demeanor, and tone to mean that the ownership of Lowe supported Daniel over Ms. Seals, and that just as Ms. Seals had suspected and feared, the ownership would not take any steps to admonish Daniel or protect Ms. Seals.

136.    Upon information and belief, Lowe's majority ownership and managing partner did instruct Hopps to pressure Ms. Seals into resigning.

137.    Combined with the prior revelation from Ms. Hopps that Mr. Daniel was a serial harasser who had subjected other women to the same harassment without discipline, and that Lowe's ownership and human resources department was aware of Mr. Daniel's misbehavior and apparently either tacitly or overtly condoned it, Ms. Seals reasonably and correctly believed that Daniel would never stop sexually harassing her, ever, and that management would never protect her.

138.    Further, given that Daniel had already ordered Ms. Seals to train her own presumptive replacement because she had rebuffed his advances and complained about his misbehavior, Ms. Seals reasonably and correctly believed that the end result of Daniel's harassment would be that she could never succeed in her career at Lowe, and would at some point be replaced or terminated.

139.    Under these conditions, Ms. Seals reasonably and objectively found her working conditions to be intolerable, and that Daniel through his harassment had destroyed her ability to succeed at Lowe, and Ms. Seals reasonably and objectively decided to resign to escape the hostile work environment and harassment.

140.    Accordingly, on July 21, 2022, Ms. Seals did as Ms. Hopps pressured her to do and emailed Ms. Hopps her letter of resignation.

141.    To the best of Ms. Seals' recollection, no one from Lowe ever contacted Ms. Seals again.

**I.      The Aftermath – Ms. Seals and Her Family Are Seriously Impacted and Ms. Seals is Forced to look for Another Career Path**

147.    The sexual harassment and sexist work environment perpetrated by Daniel and others, and condoned by Lowe's senior ownership and management, caused Ms. Seals significant emotional distress, mental anguish, stress, and feelings of anxiety and depression.

148.    Ms. Seals' constructive discharge caused her significant lost wages, future lost wages, and attendant emotional distress, mental anguish, stress, and feelings of anxiety and depression.

149.    Ms. Seals has not been able to find replacement employment in her field since her constructive termination.

150.    Instead, Ms. Seals has been forced to open her own business which, to date, has not been profitable.

151.    Finally, Ms. Seals' husband filed for divorce after her constructive discharge in this case.

152.    A significant, contributing factor to Ms. Seals' divorce was the financial, emotional, and mental stress caused by the harassment, hostile work environment, and constructive discharge alleged in this case.

153.    Ms. Seals' financial, emotional, and mental stress caused by Lowe's unlawful behavior and her constructive discharge continues through the present.

## CAUSES OF ACTION

**A.    Hostile Work Environment and Constructive Discharge Based on Sexual Harassment and Sex Discrimination under Title VII against Lowe Engineers, LLC**

154.    Ms. Seals states a cause of action for hostile work environment and constructive discharge based on sexual harassment and sex discrimination under Title VII against Lowe Engineers, LLC.

155.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against any "individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color . . . sex, or national origin[.]" 42 U.S.C. §2000e-2(a)(1).  One form of sex discrimination prohibited under Title VII is the creation of a hostile work environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

156.    To prove a prima facie case of hostile work environment based on harassment, a plaintiff must show "(1) she is member of a protected group; (2) she was the victim of uninvited sexual [or sex-based] harassment; (3) the harassment was based on sex; (4) the harassment affected a 'term, condition, or privilege' of [her] employment; and (5) her employer knew or should have known of

17

the harassment and failed to take prompt remedial action." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005). Harassing conduct affects a term or condition of employment when the conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013).

157.    Under Title VII, an employer is liable to a prevailing plaintiff in a hostile work environment case for the employee's compensatory damages and reasonable attorney's fees and costs incurred in the matter, and for all other equitable relief. *See* 42 U.S.C. § 2000e-5(g) *and also* 42 U.S.C. § 1981a *et seq.* When an employer maliciously or recklessly creates the hostile work environment, the employer is liable for punitive damages. 42 U.S.C. § 1981(a) *et seq.*

158.    Additionally, a plaintiff states a cause of action for constructive discharge because of a hostile work environment when the "working conditions [are] so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). A plaintiff who does resign under such circumstances states a claim for "constructive discharge," which is "functionally the same as an actual termination in damages-enhancing respects." *Id.* at 148. When a supervisor or owner's "official act" precipitates the resignation, then the employer may not avail itself of the so-called "*Ellerth / Faragher*" affirmative defense. *Id.* at 149.

159.    Even when an official act does not precipitate the plaintiff's resignation, an employer may not assert the *Ellerth / Faragher* defense when the employer knew of the harassment but failed to take "reasonable care to prevent and promptly correct any harassing behavior[.]" *Vance v. Ball State Univ.*, 570 U.S. 421, 430. A plaintiff who is constructively discharged because of a hostile work environment is entitled to her lost wages, compensatory damages, reasonable attorney's fees

and costs incurred in the matter, and all other equitable relief. *See* 42 U.S.C. § 2000e-5(g) (relevant to back pay and all other equitable relief) *and also* 42 U.S.C. § 1981a *et seq.* When an employer maliciously or recklessly creates the hostile work environment or forces the constructive discharge, the employer is liable for punitive damages. 42 U.S.C. § 1981(a) *et seq.*

160.    In this case, as alleged throughout this complaint, Josh Daniel routinely, repeatedly, and purposefully sexually harassed Ms. Seals from the moment she began working for Lowe until she was forced to resign to escape Daniel's mistreatment. As alleged, Daniel's harassment of Ms. Seals was purposefully designed to pressure her into accepting a romantic or sexual relationship with Daniel, despite the fact that Ms. Seals repeatedly and often told Mr. Daniel to stop and that his advances were unwelcome. Daniel's workplace misconduct was objectively inappropriate, offensive, severe, and pervasive. Daniel demanded that Ms. Seals send him photos of herself; describe what she was wearing; wear particular clothing to gratify him; talk to Ms. Seals about personal matters at all hours of the day, evening, week, and weekend; and video conference with him so he could see Ms. Seals even when she was on sick leave and wearing pajamas.

161.    Daniel did all of this while he knew that Ms. Seals was married and while Daniel himself was married. As alleged, Daniel's harassment was open, obvious, and known to everyone within Ms. Seals' Mandeville office. As alleged, everyone knew that Daniel was attracted to Ms. Seals and was harassing her specifically to coerce her into a romantic or sexual relationship with him. Both Ms. Seals and her co-workers knew that Daniel would never stop harassing her until she left Lowe or submitted to Daniel's advances. When Ms. Seals rebuffed Mr. Daniel again after he demanded to see her in her pajamas and complained to Mr. Bonneau, Daniel punished Ms. Seals by forcing her to train her own presumptive replacement. When Ms. Seals complained to human resources about sexism in the Mandeville office, Daniel accelerated the replacement training.

Daniel specifically defended himself to others by complaining that Ms. Seals was "overreacting" to his "locker room talk" and that she was "too tightly wound."

162.    Meanwhile, Ms. Seals delt with the casual sexism displayed by the men and supervisors of the Mandeville office on a recurring basis.  Don Ventura, an office supervisor, routinely expressed degrading remarks about women, and complained that women did not make good drafters compared to men.  Ms. Seals witnessed a qualified woman and applicant for employment at Lowe be passed over by the male decision-makers because, so they said, they did not want "a woman to mess up the office vibe."  Indeed, out of the twenty or so employees assigned to the Mandeville office, only two (including Ms. Seals) were women.  Ms. Seals complained to both her supervisors and Lowe human resources officer about these sexist attitudes, but no corrective action was taken. To the contrary, Daniel forced Ms. Seals to train her own replacement when he learned of the complaints.

163.    Throughout this entire time, Daniel – Ms. Seals' primary harasser – was an owner of Lowe, sat on Lowe's board of directors, and was Ms. Seals' ultimate decision-maker as the Head of Survey and regional supervisor for Lowe's Louisiana's offices.  Likewise, because Daniel was an owner and director of Lowe, and because he held the official decision-making authority to take tangible employment action against Ms. Seals, and because Daniel began forcing Ms. Seals to train her own replacement after she rebuffed the hostile work environment and complained, Daniel's actions and harassment constituted the official acts and tangible employment actions of Lowe itself, whether in fact or as a matter of law.  Accordingly, Lowe may not assert the *Ellerth / Faragher* affirmative defense in this case.  The same is true insofar as Jon Drysdale, the managing partner of Lowe and its ultimate decision maker, allegedly instructed Ms. Hopps to pressure Ms.

Seals into resigning after learning she had rebuffed and complained about Daniel's ongoing harassment.

164.    Even if this were not so, Ms. Seals still complained to literally every level of Lowe's management before she resigned.  Ms. Seals frequently complained to her first-level supervisor, Steven Hebert about Daniel's misconduct and sexism in the Mandeville office.  Hebert did nothing to protect her or change the office's sexism.  Ms. Seals complained to her second-level supervisor, John Bonneau.  Bonneau did nothing to protect her or change the office's sexism.  Ms. Seals complained to Daniel himself repeatedly.  Daniel never stopped harassing Ms. Seals.  In May or June 2021, Ms. Seals complained to Chynita Hopps, Lowe's Human Resources manager about sexism in the Mandeville office.  Ms. Hopps did nothing in response.  Indeed, as alleged, Daniel learned of the complaint and punished Ms. Seals by forcing her to train her own replacement.

165.    Finally, on or about June 20 or 21, 2021, Ms. Seals called Hopps again and specifically complained about Daniel's ongoing harassment for the past two years and indicated she felt compelled to resign.  Hopps admitted that Daniel was a serial harasser of Lowe's women employees in its Atlanta office but nothing could be done to stop him because of his ownership in the company and because Daniel's father, Bill Daniel, was the majority owner.

166.    Still, Hopps asked Ms. Seals to wait before resigning so that Hopps could speak to Lowe's senior ownership about the matter.  Hopps spoke to Lowe's highest-ranking decision maker, Jon Drysdale, and another owner, Sally Riker.  Upon information and belief, Drysdale and Riker sided with Daniel and instructed Hopps to pressure Ms. Seals into resigning.  Hopps called Ms. Seals back.  Hopps' demeanor and tone had changed dramatically.  Hopps curtly explained that if Ms. Seals was dissatisfied with her work environment, then she should resign.

167.    Ms. Seals was placed in an intolerable position.  She had now complained to every level of Lowe's management, ownership, and human resources about Daniel's harassment and the pervasive sexism in her office.  Daniel would not stop harassing her.  Nothing changed about her office's sexist work environment.  Instead, Daniel punished Ms. Seals for rebuffing him and complaining about the matter by forcing Ms. Seals to dig her own termination grave by training her presumptive replacement.

168.    Worse, Lowe's Human Resources manager admitted that ownership knew Daniel was a serial harasser but refused to stop him.  Hopps admitted she spoke to the managing partner of Lowe and another owner about Ms. Seals' complaint.  As alleged, Drysdale and Riker ordered Hopps to pressure Ms. Seals to resign.  Hopps curtly explained to Ms. Seals that if she were dissatisfied with her working environment, then she should resign.  In context, Ms. Seals reasonably and correctly understood – and any reasonable person in her position would have understood – that Lowe's ownership sided with Daniel and gave Ms. Seals a choice: suffer pervasive harassment without protection or end, or else resign.  Ms. Seals reasonably chose to resign, just as ownership wanted her to do.  Any reasonable person in Ms. Seals' position would have done likewise.

169.    Thereafter, upon information and belief, Lowe's ownership engaged in a sham counseling of Daniel in order to gin up facts that might later support a viable affirmative defense in the case by ordering Daniel to undergo a 2 to 4 hour anti-harassment training session.  Lowe never contacted Ms. Seals again.  Lowe never offered Ms. Seals her job back.

170.    At all times, the harassers and decision-makers involved in this case were the owners and senior most managers and human resources officers of Lowe.  Upon information and belief, each harasser, owner, and officer knew that Daniel's behavior was unlawful and harassing under Title VII, but they excused his behavior and sided with him against Ms. Seals anyway.  Lowe's behavior,

through its owners and officers, in not only tolerating Daniel's harassment but pressuring Ms. Seals to resign in the face of such harassment, is quintessentially malicious under the circumstances. Accordingly, Lowe is liable to Ms. Seals for punitive damages under Title VII.

171.   Accordingly, Lowe is liable to Ms. Seals for the hostile work environment it created and the sexual harassment it perpetrated and condoned in violation of Title VII of the Civil Rights Act of 1964, and for Ms. Seals' resulting constructive discharge, and Lowe owes Ms. Seals all available and appropriate compensatory, statutory, and equitable remedies, including her lost back wages, lost future wages, compensatory damages, statutory damages, punitive damages, and reasonable attorney's fees and litigation costs incurred in this matter.

**B.     Hostile Work Environment and Constructive Discharge Based on Sexual Harassment and Sex Discrimination under the LEDL against Lowe Engineers, LLC**

172.   Ms. Seals states a cause of action for hostile work environment and constructive discharge based on sexual harassment and sex discrimination under the Louisiana Employment Discrimination Law ("LEDL") against Lowe Engineers, LLC.

173.   Under the LEDL, no employer may discriminate against an employee based on her sex. La. Rev. Stat. Ann. § 23:332 *et seq.*  Louisiana's employment discrimination statute is modeled after Title VII, and therefore analysis under the two statutes is functionally identical.  *See e.g.*, *Alderman v. Great Atl. & Pac. Tea Co.*, Inc., 332 F.Supp.2d 932, 936 (E.D. La. 2004) (noting "[b]ecause of its doctrinal similarity to Title VII, and the related social goals of both statutes, Louisiana courts routinely look to Title VII to interpret the LEDL").  Like Title VII, the LEDL forbids the creation of a hostile work environment based on sexual harassment and sex discrimination.  *See, e.g.*, *Rodrigue v. PTS Mgmt. Grp., LLC*, 550 F.Supp.3d 376, 393-94 (W.D. La. 2021) (impliedly holding).

174.   Accordingly, for all the reasons stated throughout this complaint, and specifically

incorporating the analysis of plaintiff's claims of hostile work environment and constructive discharge against Lowe under Title VII, Lowe's conduct likewise violated the LEDL, and Lowe is liable to Ms. Seals for all available and appropriate compensatory, statutory, and equitable relief, including her lost back wages, lost future wages, compensatory damages, statutory damages, and reasonable attorney's fees and litigation costs incurred in this matter.

## JURY DEMAND

Ms. Seals requests a trial by jury on all issues and causes of action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Jessica W. Seals prays that this complaint be deemed good and sufficient; that it and summons be served upon defendant Lowe Engineers, LLC; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant (1) declaring that Lowe's conduct did violate Title VII of the Civil Rights Act of 1964 and all other applicable statutes and laws and (2) awarding all damages and equitable relief due to plaintiff in this hostile work environment and constructive discharge matter, including her lost back wages, lost future wages, compensatory damages, statutory damages, punitive damages (under Title VII), reasonable attorney's fees, litigation costs, and legal interest from the date of demand, and for all other general and equitable relief to which plaintiff is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
Alec W. Szczechowski (Bar #38422)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com

*Attorneys for Jessica W. Seals*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**JESSICA W. SEALS**

          **Plaintiff,**

     **v.**                                    **CIVIL NO. PENDING**

**LOWE ENGINEERS, LLC**

          **Defendant.**

## DECLARATION OF JESSICA W. SEALS

I, Jessica W. Seals, am over the age of 18 years, and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following facts are true and correct to the best of my knowledge and recollection at the time this declaration is made:

1.      I am the named plaintiff in the lawsuit *Jessica W. Seals v. Lowe Engineers, LLC* soon to be filed in the United States District Court for the Eastern of Louisiana.

2.      I authorized my attorney, Kevin S. Vogeltanz, to file the original Complaint in this matter and to assert all the causes of action included therein.

3.      I verify that I reviewed each allegation in the Complaint and further verify that, at the time the Complaint was filed, each allegation (either as directly stated or as stated in the alternative) is true and correct to the best of my knowledge, information, memory, and belief.

                            5/21/2022
Executed on this date _____

                            DocuSigned by:

                            *Jessica Seals*
        _____
                            6416A327D216488...
        Jessica W. Seals